**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION**

| | |
|---|---|
| IN RE: AQUEOUS FILM-FORMING FOAMS PRODUCTS LIABILITY LITIGATION | MDL No. 2:18-mn-2873-RMG |

**This document relates to: 2:18-cv-3435-RMG**

*City of Westfield, Massachusetts v. 3M Company
(f/k/a Minnesota Mining and Manufacturing, Co.);
Chemguard, Inc.; Tyco Fire Products L.P.
(successor-in-interest to The Ansul Co.);
United States Department of the Air Force;
United States Air National Guard Bureau;
John Doe Defendants 1-49*,
No. 3:18-cv-30027 (D. Mass.)

## FIRST AMENDED COMPLAINT

### I.     INTRODUCTION

1.     Plaintiff, City of Westfield, Massachusetts ("Plaintiff" or "Westfield"), brings this action to recover the costs necessary to protect the public health, safety, welfare and the environment, comply with applicable soil and groundwater cleanup standards, and prevent the contamination of drinking water resources by developing, constructing, operating and maintaining water treatment systems and by restoring the groundwater quality and eliminating contamination caused and/or created by the Defendants' manufacture and/or use of aqueous film forming foam ("AFFF").

2.     Defendants, 3M Company, Chemguard, Inc., Tyco Fire Products LP (as successor-in-interest to the Ansul Company), and the John Doe Defendants (collectively "Manufacturing Defendants") manufactured, distributed and/or sold AFFF, a firefighting agent

used for fighting Class B fires, that was used at the Westfield-Barnes Regional Airport.  Class B

fires are fires whose fuel is flammable liquid.

3.      The AFFF manufactured by Defendants contain the fluorinated surfacants PFOS

(perfluorooctanesulfonic acid) and/or PFOA (perfluorooctanoic acid) (collectively "PFAS")

and/or contain the precursors of PFOS and PFOA.

4.      Defendants knew or should have known that PFOS and PFOA are persistent when

released into the environment and present significant risks to groundwater, drinking water

supplies and human health.

5.      Manufacturing Defendants marketed and sold AFFF with the knowledge that

PFOS and/or PFOA would be released into the environment in firefighting training exercises and

in firefighting emergencies.

6.      The United States Air Force leased property from Plaintiff and, as a direct and

proximate result of the use or misuse of Manufacturing Defendants' AFFF at or adjacent to the

Westfield-Barnes Regional Airport, Plaintiff suffered the damages described in this Complaint.

7.      Through this action, Plaintiff seeks compensatory damages for the damage to its

property, for the costs to investigate, remediate, and monitor PFOS and PFOA contamination on

its property and in the groundwater affected by the use of AFFF, and the costs to investigate,

design, construct, operate and maintain water treatment systems necessary to properly filter

and/or treat PFOS and PFOA to remove it from Plaintiff's drinking water supplies, as well as

reasonable attorneys' fees and costs.

## II.      PARTIES

8.      Plaintiff is a duly incorporated body politic and incorporated under the laws of the

Commonwealth of Massachusetts, with its primary address at 59 Court Street, Westfield,

Massachusetts 01085. Westfield owns, operates and maintains a drinking water supply system that serves over 11,000 residential and commercial customer connections.

9.      Defendant 3M Company (f/k/a Minnesota Mining and Manufacturing Company) ("3M") is a corporation organized and existing under the laws of the state of Delaware, having its principal place of business at 3M Center, St. Paul, Minnesota 55133.

10.     Beginning before 1970 and until at least 2002, 3M manufactured, distributed, developed, distributed, released, trained users of, produced instructional materials for, sold and/or otherwise handled and/or used PFAS that is the subject of this Complaint, including in Massachusetts and the District of Massachusetts, in such a way as to result in the contamination of Plaintiff's public drinking water supplies.

11.     3M does business throughout the United States, including conducting business in Massachusetts where it has a 60,000 square foot plant in Chelmsford and an 80,000 square foot plant situated on 26 acres in Methuen.

12.     3M is registered to do business in Massachusetts.

13.     3M was the only company that manufactured or sold AFFF containing PFOS.

14.     3M manufactured and/or distributed and/or sold military specification AFFF that was used by the USAF at the Westfield-Barnes Regional Airport.

15.     Defendant Tyco Fire Products LP ("Tyco") is a limited partnership formed in the State of Delaware and does business throughout the United States, including conducting business in Massachusetts, with its principal place of business at One Stanton Street, Marinette, Wisconsin 54143. Tyco is an indirect subsidiary ultimately wholly owned by Johnson Controls International plc, an Irish public limited company listed on the New York Stock Exchange [NYSE: JCI]. Tyco is the successor-in-interest of The Ansul Company ("Ansul"), having

acquired Ansul in 1990. (Ansul and Tyco, as the successor-in-interest to Ansul, will hereinafter be collectively referred to as "Tyco/Ansul.").

16.     Tyco is registered to do business in Massachusetts.

17.     Beginning in or around 1975, Ansul manufactured and/or distributed and sold AFFF that contained fluorocarbon surfactants containing PFOA throughout the United States, including in Massachusetts and the District of Massachusetts. After Tyco acquired Ansul in 1990, Tyco/Ansul continued to manufacture and/or distribute and sell AFFF that contained fluorocarbon surfactants containing PFOA, including in Massachusetts and the District of Massachusetts.

18.     Tyco/Ansul marketed, developed, manufactured, distributed released, trained users of, produced instructional materials for, sold and/or otherwise handled and/or used PFAS that is the subject of this Complaint, including in Massachusetts and the District of Massachusetts, in such a way as to result in the contamination of Plaintiff's public drinking water supplies.

19.     Tyco/Ansul manufactured and/or distributed and/or sold military specification AFFF that was used by the USAF at the Westfield-Barnes Regional Airport.

20.     Tyco's Ansul brand is distributed via distributors located within Massachusetts, including distributors located in Hampden County, Massachusetts where the City of Westfield is located.

21.     Defendant Chemguard is a Texas corporation and does business throughout the United States, including conducting business in Massachusetts and the District of Massachusetts, with its principal place of business at 204 South Sixth Avenue, Mansfield, Texas 76063.

4

22.     Beginning in or around 1994, Chemguard manufactured and/or distributed and sold AFFF that contained fluorocarbon surfactants containing PFOA.

23.     Chemguard manufactured and/or distributed and/or sold military specification AFFF that was used by the USAF at the Westfield-Barnes Regional Airport.

24.     Tyco acquired Chemguard in 2011.

25.     Chemguard's fire suppression products are distributed through at least two authorized Chemguard Dealers in Massachusetts – American Fire Equipment Company located in South Easton, Massachusetts and Industrial Protection Services, LLC located in Wilmington, Massachusetts.

26.     Chemguard marketed, developed, manufactured, distributed released, trained users of, produced instructional materials for, sold and/or otherwise handled and/or used PFAS that is the subject of this Complaint, including in Massachusetts and the District of Massachusetts, in such a way as to result in the contamination of Plaintiff's public drinking water supplies.

27.     Defendant United States Air Force ("USAF") is a branch of the United States Armed Forces with headquarters at the Pentagon, Washington, D.C. 20301-0001.

28.     Defendant United States Air National Guard Bureau ("ANG") is a bureau of the United States Department of Defense with headquarters at 1636 Defense, Pentagon Suite 1E169, Washington, D.C. 20301-0001.

29.     Defendants USAF/ANG are federal governmental entities susceptible to suit pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 2671-80.

30.     Upon information and belief, Defendant John Does 1-49 were manufacturers or sellers of AFFF. Although the identities of the John Doe Defendants are currently unknown, it is

expected that their names will be ascertained during discovery, at which time Plaintiff will move for leave of this Court to add those individuals' actual names to Plaintiff's First Amended Complaint as Defendants.

### III.    JURISDICTION AND VENUE

31.    This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332.

32.    Plaintiff is filing this Amended Complaint in the District of South Carolina pursuant to the December 7, 2018 Transfer Order by the Judicial Panel on Multidistrict Litigation and 28 U.S.C. § 1407.  If the December 7, 2018 Transfer Order did not apply, venue would be appropriate in the District of Massachusetts pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the property that is the subject of the action is situated in that judicial district.

33.    On March 26, 2018, Plaintiff filed an administrative tort claim (No. 18-11297) with the USAF pursuant to the FTCA, 28 U.S.C. § 2675(a).  On October 11, 2018, the USAF denied Plaintiff's claim.

34.    This Court has jurisdiction over the USAF/ANG pursuant to 28 U.S.C. § 1346(b)(1) which provides that district courts have original and "exclusive jurisdiction of any civil action on claims against the United States."

### IV.    FACTUAL ALLEGATIONS

#### A.    PFOS and PFOA

35.    PFOS and PFOA fall within a class of chemicals known as perfluoroalkyl substances ("PFAS").

36.    PFOS and PFOA are characterized by a carbon-fluorine bond that is one of the strongest chemical bonds that occur in nature.

37.     PFOS and PFOA are extremely stable and resistant to metabolic and environmental degradation.

38.     PFOS and PFOA are extremely persistent in the environment and in the human body, and bioaccumulate and biomagnify in humans and wildlife.

39.     PFOS and PFOA are water soluble and can migrate readily from soil to groundwater, where they can be transported long distances.

40.     PFOS and PFOA are thermally, chemically, and biologically stable and resistant to biodegradation, atmospheric photo-oxidation, direct photolysis, and hydrolysis.

41.     Water that is processed by typical municipal water treatment plants does not result in the removal, filtration or treatment of PFOS and/or PFOA.

42.     PFOS and PFOA can cross the placenta from mother to fetus and can be passed to infants through breast milk.

43.     According to the Massachusetts Department of Environmental Protection, exposure to PFOA and PFOS above certain concentrations may result in certain health effects including, but not limited to:

a.      kidney cancer;

b.      testicular cancer;

c.      developmental effects to fetuses during pregnancy or to breastfed infants;

d.      liver effects;

e.      immune effects; and

f.      thyroid effects.

44.     Under the U.S. Environmental Protection Agency's ("EPA") Guidelines for Carcinogen Risk Assessment, there is Suggestive Evidence of Carcinogenic Potential of PFOS and PFOA in humans.

45.     The International Agency for Research on Cancer has concluded that PFOA is possibly carcinogenic to humans.

46.     In the early 1960's, 3M and the United States Naval Research Laboratory developed AFFF, a product created to extinguish jet fuel fires, which are largely impervious to water, by smothering them.  3M's AFFF, which is produced through a 3M process called electrochemical fluorination, contained PFOS.

47.     3M is the only manufacturer who used the electrochemical fluorination process, and therefore produced the only AFFF that contained PFOS, as opposed to PFOA.

48.     Other formulations of AFFF purchased by the Department of Defense manufactured by Tyco/Ansul and Chemguard are synthesized through telomerization and contained PFAS including PFOA.  Both processes include formulations containing chemicals that can break down into other PFAS.

49.     AFFF that contained PFAS, including PFOS and PFOA, or contained precursors to PFAS, was developed in the 1960s as an alternative to existing protein-based firefighting foams.

50.     It is estimated that 75 percent of the military AFFF inventory is electrochemical fluorinated-based product.  During most of the past thirty years, 3M was the primary supplier of AFFF to the Department of Defense stock system.

51.     The military Qualified Products Database listed 3M AFFF products as early as 1970, and Ansul products as early as 1976.

52.     According to a 2011 Department of Defense risk alert document, "through 2001, the DoD purchased AFFF from 3M and/or Ansul, Inc. 3M supplied PFOS-based AFFF under the product name, 3M Light Water AFFF."  USAF, ANG and other personnel conducted training

exercises at Westfield-Barnes Regional Airport including firefighting and explosion training that used AFFF, and otherwise used AFFF that was manufactured by Defendants for decades.

53.    Upon information and belief, instructions, labels and material safety data sheets were provided with the AFFF by Manufacturing Defendants, which, at least at significant times, did not fully describe the health and environmental hazards of AFFF which Manufacturing Defendants knew or should have known.

54.    Upon information and belief, Manufacturing Defendants had known of these health and environmental hazards for years.

55.    Throughout the 1950s, 3M's own internal animal studies consistently concluded that PFAS are "toxic."

56.    A 1956 study at Stanford University concluded that PFAS manufactured by 3M bind to proteins in blood.

57.    3M knew as early as the mid-1950s that PFAS accumulate in humans and animals.

58.    By the early 1960s, 3M understood that PFAS are stable and persist in the environment and that they do not degrade.

59.    According to a deposition transcript in a lawsuit brought by the State of Minnesota against 3M (No. 27-cv-10-28862 (4th Judicial Dist. Ct. Hennepin Cty.)) ("Minn. Lawsuit") for damages to the state's natural resources from PFAS, 3M began monitoring the blood of its employees for PFAS, as early as 1976, because the company was "concerned" about "health" effects of PFAS.  3M documents from 1977 relating to these worker tests further confirmed that PFAS bioaccumulate.

60.    A 1978 study by 3M on PFOS and PFOA confirmed that "these chemicals are

likely to persist in the environment for extended periods unaltered by microbial catabolism."

61.    Studies undertaken by 3M in the 1970s demonstrated that PFAS were even "more toxic than was previously believed."

62.    A technical journal in 1970 observed that after conducting tests on a 3M product containing PFAS that the product was "highly derogatory to marine life and the entire test program had to be abandoned to avoid severe local stream pollution."

63.    In 1979, a 3M scientist recognized in Interoffice Correspondence that PFAS posed a cancer risk because they are "known to persist for a long time in the body and thereby give long-term chronic exposure."

64.    According to the Minnesota Attorney General, despite 3M's understanding of the risks associated with PFAS, 3M engaged in a campaign to distort scientific research concerning PFAS and to suppress research into the potential harms associated with PFAS.

65.    According to a deposition transcript from the Minn. Lawsuit, 3M recognized that if the public and governmental regulators became aware of the risks associated with PFAS, 3M would be forced to halt its manufacturing of PFAS and PFAS-derived products that would result in the loss of hundreds of millions of dollars in annual revenue.

66.    The potential loss of 3M's massive profits from PFAS drove 3M to engage in a campaign to influence the science relating to PFAS and, according to internal 3M documents, to conduct scientific "research" that it could use to mount "[d]efensive [b]arriers to [l]itigation."

67.    A key priority of an internal 3M committee—referred to as the FC Core Team—was to "[c]ommand the science" concerning "exposure, analytical, fate, effects, human health and ecological" risks posed by PFAS and for 3M to provide "[s]elective funding of outside research through 3M 'grant' money."

68.     In exchange for providing grant money to friendly researchers, 3M obtained the right to review and edit draft scientific papers regarding PFAS and sought control over when and whether the results of scientific studies were published at all.

69.     A significant aspect of 3M's campaign to influence independent scientific research involved 3M's relationship with Professor John Giesy.  3M provided millions of dollars in grants to Professor Giesy, who presented himself publicly as an independent expert but, as revealed in his deposition transcript in the Minn. Lawsuit, he privately characterized himself as part of the 3M "team."

70.     According to Professor Giesy's deposition transcript in the Minn. Lawsuit, Professor Giesy worked on behalf of 3M to "buy favors" from scientists in the field for the purpose of entering into a "quid pro quo" with the scientists.

71.     According to emails produced by Professor Giesy in the Minn. Lawsuit, through his position as an editor of academic journals, Professor Giesy reviewed "about half of the papers published in the area" of PFAS ecotoxicology and billed 3M for his time reviewing the articles and, in performing reviews of these articles, Professor Giesy stated that he was always careful to ensure that there was "no paper trail to 3M" and that his goal was to "keep 'bad' papers [regarding PFAS] out of the literature" because "in litigation situations" those articles "can be a large obstacle to refute."

72.     According to Professor Giesy's deposition transcript in the Minn. Lawsuit, despite spending most of his career as a professor at public universities, Professor Giesy has a net worth of approximately $20 million which is, according to the Minnesota Attorney General, in part, a direct result from his long-term involvement with 3M for the purpose of suppressing independent scientific research on PFAS.

73.     Manufacturing Defendants marketed and promoted its AFFF products with the assistance of industry funded trade groups including, but not limited to, the Fire Fighting Foam Coalition.

74.     Manufacturing Defendants' manufacturing and/or distributing of PFAS resulted in the release of PFAS into the air, surface waters, ground water, soils and landfills.  Through their involvement and/or participation in the creation of consumer or other commercial products and materials and related training and instructional materials and activities, including in Massachusetts and the District of Massachusetts, the Manufacturing Defendants knew, foresaw, and/or reasonably should have known and/or foreseen that PFAS from those products would contaminate the environment including but not limited to the groundwater relied upon by Plaintiff as its public drinking water supply.

75.     At all relevant times, Manufacturing Defendants encouraged the continued and/or the increased use and release into the environment of PFAS, including into Massachusetts and the District of Massachusetts, by its customers and others, including but not limited to through manufacture, use, and release of AFFF containing or made with PFOS or PFOA.

76.     Manufacturing Defendants were and/or should have been aware, knew and/or should have known, and/or foresaw or should have foreseen that its marketing, development, manufacture, distribution, release, training of users of, production of instructional materials about, sale and/or other handling and/or use of PFAS and PFAS containing materials, including in Massachusetts, would result in the contamination of groundwater including groundwater used by Plaintiff as its public drinking water supply.

77.     Under pressure from EPA, on May 16, 2000, 3M announced it would phase out production of PFOS and PFOA, in part, because of the chemicals' biopersistence.

78.    3M, who was the predominant manufacturer of AFFF, ceased production of PFOS-based AFFF in 2002.

79.    An EPA internal memo on the day of 3M's phase-out announcement stated: "3M data supplied to EPA indicated that these chemicals are very persistent in the environment, have a strong tendency to accumulate in human and animal tissues and could potentially pose a risk to human health and the environment over the long term . . . . *[PFOS] appears to combine Persistence, Bioaccumulation, and Toxicity properties to an extraordinary degree*." (emphasis added).

80.    On May 25, 2016, EPA issued a Notice of its revised lifetime health advisory for PFOS and PFOA as follows: "0.07 parts per billion (70 parts per trillion) for PFOS and PFOA. Because these two chemicals cause similar types of adverse health effects, EPA recommends that when both PFOS and PFOA are found in drinking water the combined concentrations of PFOS and PFOA be compared with the 0.07 part per billion HA level."

81.    On February 14, 2019, EPA announced a PFAS Action Plan "to help states and local communities address PFAS and protect our nation's drinking water" by "moving forward with several important actions, including the maximum contaminant level process . . . ."

**B.    Westfield-Barnes Regional Airport**

82.    The Westfield-Barnes Regional Airport ("Airport") is located at 110 Airport Road in Westfield, Massachusetts.  The Air National Guard ("ANG") has maintained operations at the Airport since 1947.  The ANG occupies approximately 182 acres leased from Westfield in the northern end of the Airport.

83.     On December 15, 2006, the ANG entered into a valid and binding lease agreement (attached as Ex. A) with the City to lease approximately 182 acres of land located at the northern end of the Westfield-Barnes Regional Airport (the "Base").

84.     As part of its lease agreement with the City, the ANG agreed to comply with all federal, state and local environmental statutes, regulations, executive orders or ordinances relating to the use or cleanup of any toxic chemicals and agreed to pay the City for any damages caused by the ANG's use of the Base.

85.     Upon information and belief, Manufacturing Defendants' AFFF containing PFOA and/or PFOS was used at the Airport by the Air National Guard from approximately 1970 to 2016 during fire training exercises and in response to a small number of plane crashes.

86.     According to a 2016 ANG Report, there are eight potential areas at the Base where AFFF was released.

87.     According to a 2016 ANG Report, the ANG caused numerous releases of AFFF on or near the Base.

88.     According to ANG reports, the ANG "accidentally" released AFFF that was under its control on or near the ANG's Base on at least two occasions.

89.     The use of Manufacturing Defendants' AFFF at the Westfield-Barnes Regional Airport impacted soils as well as groundwater used by the City as a source of its public drinking water supplies.

90.     The use of Manufacturing Defendants' AFFF in fire training exercises elsewhere on or adjacent to the Westfield-Barnes Regional Airport caused additional impacts to soils and groundwater.

14

### C.    Westfield's Drinking Water System

91.    The City of Westfield has operated a water system since at least 1873 when the Massachusetts Legislature passed an act authorizing Westfield to construct a reservoir system in the Town of Montgomery.

92.    The Tekoa and Montgomery Reservoirs were built in 1874.  In 1929, the Granville Reservoir was built.  The Montgomery Reservoir was used until 1974 when a filtration plant would have been required for further use and is currently in an "Emergency Use Only" status.

93.    The Sackett Distribution Reservoir, located in Southwick at the site of the Water Filtration Plant, was built in 1899.  It was originally used as a storage area for water to Westfield from the Winchell and Japhet reservoirs but is no longer used for that purpose.  It now serves as a holding area for the Water Filtration Plant treatment process.

94.    Beginning in the late 1950s a series of groundwater wells were installed.  The following wells tapped the Barnes Aquifer, a large underground water source:

    1957 - Well No. 1 was installed off Holyoke Road
    1958 - Well No. 2 was installed off Union Street
    1967 - Wells 3 and 4 were installed off of Shaker Road
    1969 - Wells 5 and 6 were installed off Northwest Road
    1977 - Wells 7 and 8 were installed off East Mountain Road

### D.    PFAS in Westfield's Water System

95.    Under the Federal Safe Drinking Water Act ("SDWA"), the Unregulated Contaminant Monitoring Rule ("UCMR") was developed by EPA to evaluate constituents that are likely to be present in drinking water but do not currently have health-based standards set under the SDWA.  EPA establishes a new list of no more than 30 UCMR constituents every five years primarily based on the Contaminant Candidate List.

96.    EPA uses the information obtained from this monitoring as the primary source of occurrence and exposure information to establish potential future regulatory actions for the protection of public health.

97.    The third Unregulated Contaminant Monitoring Rule ("UCMR 3") was published on May 2, 2012 and required monitoring for 30 contaminants (28 chemicals and two viruses) between 2013 and 2015.  The UCMR 3 list included six PFAS: PFOS, PFOA, perfluorobutanesulfonic acid ("PFBS"), perfluorohexanesulfonic acid ("PFHxS"), perfluoroheptanoic acid ("PFHpA") and perfluorononanoic acid ("PFNA").

98.    Westfield's water system was required to comply with UCMR 3 and tested for all the listed contaminants.  UCMR 3 sampling resulted in the following PFAS detections:

| | | |
|---|---|---|
| 19-Aug-13 | PFHxS | 0.10 µg/L[1] |
| 27-Feb-13 | PFOA | 0.0430 µg/L |
| 27-Feb-13 | PFHxS | 0.17 µg/L |
| 27-Feb-13 | PFHpA | 0.0110 µg/L |
| 19-Aug-13 | PFOS | 0.12 µg/L |
| 19-Aug-13 | PFOA | 0.0280 µg/L |
| 27-Feb-13 | PFOS | 0.16 µg/L |

99.    On January 9, 2009, EPA issued provisional health advisories for PFOS and PFOA, setting the PFOA health advisory at 0.4 ppb and PFOS at 0.2 ppb.  At that time, none of the PFAS detected in Westfield's water system exceeded these provisional health advisories.

100.    On May 25, 2016, EPA issued a Notice of its revised lifetime health advisory for PFOS and PFOA as follows: "0.07 parts per billion (70 parts per trillion ("ppt")) for PFOS and PFOA.  Because these two chemicals cause similar types of adverse health effects, EPA recommends that when both PFOS and PFOA are found in drinking water the combined

---

[1] µg/L is an abbreviation for micrograms/litre.  One µg/L is also referred to as one "parts per billion" or "ppb."

concentrations of PFOS and PFOA be compared with the 0.07 part per billion [health advisory] level."

101.    Prior to the May 25, 2016 health advisory, the levels of PFOS and PFOA in Westfield's water supplies were below the applicable EPA health advisories.

102.    Following the EPA's publication of its health advisory on May 25, 2016, Westfield, in consultation with the Massachusetts Department of Environmental Protection ("MassDEP"), determined that the samples taken in 2013 by the Westfield Water Division exceeded the new EPA lifetime health advisory in Well # 7 & Well # 8 and require treatment. Westfield's Wells # 7 & Well # 8 will not be put back into service until approved for use by MassDEP.

103.    The water supply accessed by Wells #7 and #8 was contaminated from the use of AFFF, and/or release of AFFF, at or adjacent to the Westfield-Barnes Regional Airport and requires filtration.

104.    Plaintiff's Well # 1 and Well # 2 have also been contaminated with Defendants' PFAS and MassDEP has directed the City to minimize use of these wells, including directing the City to exclusively use the well with the lower most recent sampling result, until treatment is provided.  The City has installed temporary granulated active carbon filtration on Well #2 and a permanent facility to filter both Wells #1 and #2 is in the design phase.

105.    On June 27, 2016, Westfield implemented water use restrictions due to a water supply shortage caused by the removal of Wells # 7 and # 8 from service as a result of the PFOS and PFOA contamination.  The water use restriction was extended on September 15, 2016 and again on March 8, 2017.  In June 2017, the water use restrictions were lifted, although future restrictions/bans may be imposed if conditions warrant.

106.    In 2017, the City performed a bench-scale perfluorochemical treatability study to determine treatment options for the City's contaminated wells.  The combined levels of PFOA and PFOS that were detected as part of this study were as high as .3018 ppb which exceeds EPA's health advisory of 0.07 ppb by more than 430 percent.

**E.    21E Notice**

107.    On or about October 11, 2016, MassDEP issued a Notice of Responsibility ("NOR") to the Air National Guard under M.G.L. c. 21E and 310 CMR 40.000.  In its NOR, MassDEP stated:

> MassDEP has reason to believe that there has been a release to the environment which has resulted in designating the Barnes Air National Guard Base (Barnes ANG Base) as a disposal site as defined by the MCP.  Specifically, [PFAS], including [PFOA and PFOS] and other related compounds that are contained in [AFFF] may have been released to the soil and groundwater at Barnes ANG Base (the Site) and thereby impacted the groundwater resource which supplies the City of Westfield Public Water Supply Wells located downgradient of the Base. Specifically, Wells #7 and #8 located a half mile south of Site 6: the Old Fire Training Area and Wells # I and #2 which are 1.5 to 2 miles south of the Base have been impacted.  According to the City of Westfield Water Department, Well #7 and Well #2 were removed from service due to exceedances of the EPA Health Advisory level for PFAS.

108.    The October 11, 2016 NOR alleged that PFOA and PFOS from AFFF may have been released to the soil and groundwater at the ANG base which has impacted the City of Westfield's Public Water Supply.  The NOR directed that the ANG prepare an Imminent Response Plan, pursuant to 310 CMR 40.0412(1), to evaluate and properly address the presence of PFAS above 0.07 ppb in Westfield's drinking water supply.

## COUNT I

### Breach of Implied Warranty of Merchantability – Design Defect
### Against Manufacturing Defendants

109.    Plaintiff repeats and restates the allegations set forth in the previous paragraphs of this Complaint as if fully set forth herein.

110.    At all times relevant herein, Manufacturing Defendants were engaged in the business of researching, designing, manufacturing, testing, distributing and selling AFFF containing PFOS or PFOA.  By doing so, Manufacturing Defendants impliedly warranted that AFFF was merchantable, safe, and fit for ordinary purposes for which it was used, including for fire-fighting training exercises.

111.    It was reasonably foreseeable that the AFFF containing PFOS and/or PFOA that Manufacturing Defendants manufactured and/or distributed and sold would contaminate Plaintiff's property and the groundwater under Plaintiff's property and cause damages.

112.    Manufacturing Defendants' AFFF products were manufactured for placement into trade or commerce.

113.    Manufacturing Defendants marketed and sold AFFF for use in controlling and extinguishing aviation, marine, fuel and other shallow spill fires.

114.    As manufacturers, Manufacturing Defendants owed a duty to all persons whom its products might foreseeably harm, including Plaintiff, not to market any product which is unreasonably dangerous in design for its reasonably anticipated use.

115.    By manufacturing and selling AFFF containing PFOA and/or PFOS, Manufacturing Defendants warranted that such AFFF was merchantable, safe and fit for ordinary purposes.

116.    The AFFF as manufactured and/or sold by Manufacturing Defendants reached the USAF without substantial change in its condition and was used by the USAF in a reasonably foreseeable and intended manner.

117.    The AFFF as manufactured and/or sold by Manufacturing Defendants was "defective" and "unreasonably dangerous" when it left Defendants' control, entered the stream of commerce, and was received by the USAF because it was dangerous to an extent beyond that which would be contemplated by the ordinary user of AFFF.

118.    The AFFF manufactured and/or sold by Manufacturing Defendants was defective in design because it can result in the contamination of soil and groundwater with PFAS creating a significant threat to groundwater and drinking water supplies.

119.    The AFFF manufactured and/or sold by Manufacturing Defendants did not meet a consumer's reasonable expectation as to its safety because of its propensity to contaminate soil and groundwater when used as intended.

120.    Manufacturing Defendants failed to develop and make available alternative AFFF products that were designed in a safe or safer manner, even though such products were technologically feasible, practical and commercially viable and marketable at the time Manufacturing Defendants introduced AFFF containing PFAS into the stream of commerce.

121.    According to the USAF, current firefighting foams that have been approved for purchase and use by the Department of Defense, do not contain PFOS and contain little or no PFOA.

122.    The specific risk of harm in the form of soil, groundwater and drinking water contamination from AFFF containing PFAS that Manufacturing Defendants manufactured and/or sold was reasonably foreseeable or discoverable by Manufacturing Defendants.

123.    PFOS and PFOA are dangerous to an extent beyond that which would be contemplated by the ordinary consumer of AFFF.  This design defect constitutes a breach of Manufacturing Defendants' implied warranty of merchantability.

124.    The design, formulation, manufacture and/or distribution and sale of AFFF containing PFOS and/or PFOA that were known to be toxic and extremely mobile and persistent in the environment, was unreasonably dangerous.

125.    As a direct and proximate result of Manufacturing Defendants' design defect, Plaintiff has been, or will be, required to investigate, design, construct and operate and maintain water treatment systems necessary to filter PFOS and PFOA from Westfield's drinking water system, suffered property damage requiring investigation, clean-up, abatement, remediation, and monitoring costs and suffered other damages in an amount to be determined at trial. Manufacturing Defendants are strictly, jointly, and severally liable for all such damages.

## COUNT II

### Breach of Implied Warranty of Merchantability – Failure to Warn
### Against Manufacturing Defendants

126.    Plaintiff repeats and restates the allegations set forth in the previous paragraphs as if fully set forth herein.

127.    The use of Manufacturing Defendants' AFFF at the Airport was a reasonably foreseeable use.  Manufacturing Defendants knew or should have known that the use of their AFFF in this manner can contaminate soil and groundwater with PFOS and/or PFOA, creating a significant threat to human health and the environment.

128.    It was foreseeable that PFOS and/or PFOA from the AFFF that Manufacturing Defendants manufactured and sold would enter the soil and groundwater of Plaintiff's Property

and would result in the contamination of drinking water supplies that rely upon the groundwater for the source of drinking water.

129.     Manufacturing Defendants had a duty to warn the users of AFFF and Plaintiff (who was easily identifiable as a public water supplier with drinking water supplies near a USAF base that was using AFFF) of these hazards which were known to Manufacturing Defendants. Manufacturing Defendants, however, failed to provide adequate warnings of these hazards.

130.     Manufacturing Defendants could have effectively communicated a warning to Plaintiff, an easily identifiable public water supplier, but chose not to.

131.     Manufacturing Defendants' failure to issue the proper warnings relating to AFFF containing PFOS and/or PFOA affected the market's acceptance of AFFF containing PFOS and/or PFOA.

132.     Manufacturing Defendants' failure to issue the proper warnings relating to AFFF containing PFOS and/or PFOA prevented the users of the product from treating it differently with respect to its use and environmental cleanup.

133.     Manufacturing Defendants' failure to issue the proper warnings related to AFFF containing PFOS and/or PFOA prevented the users of the products from seeking alternative products, including but not limited to using alternative products for purposes of training in the use of AFFF.

134.     Manufacturing Defendants' action in placing AFFF containing PFOS and/or PFOA into the stream of commerce was a direct and proximate cause of Plaintiff's injury.

135.     As a direct and proximate result of the Manufacturing Defendants' failure to warn, Plaintiff has suffered property damage, requiring investigation, clean-up, abatement,

remediation, and monitoring costs and suffered other damages in an amount to be determined at trial. Manufacturing Defendants are strictly, jointly, and severally liable for all such damages.

## COUNT III

**Negligence**
**Against all Defendants**

136.    Plaintiff repeats and restates the allegations set forth in the previous paragraphs of this Complaint as if fully set forth herein.

137.    Defendants owed a legal duty to Plaintiff. The use of AFFF at the Airport was a reasonably foreseeable use. Defendants knew or should have known that AFFF used in this manner can contaminate soil and groundwater with PFAS, creating a significant threat to drinking water supplies, including Plaintiff's. Defendants had a duty to prevent the release of PFAS, including but not limited to PFOS and/or PFOA, in the foreseeable use of AFFF.

138.    Manufacturing Defendants breached their duties when they negligently manufactured a dangerous product - AFFF -, negligently marketed, distributed, and sold that product, and/or negligently failed to give adequate warning that such products should not have been used in a manner such as to result in the contamination of soil and groundwater.

139.    Defendants could have effectively communicated a warning regarding the dangers of AFFF to Plaintiff, an easily identifiable public water supplier, but chose not to.

140.    The USAF/ANG breached their duties by using, storing, transporting or handling AFFF in a manner that resulted in the release of PFAS into the environment and the contamination of groundwater used by Westfield as a source of its public drinking water supplies.

141.    As a direct and proximate result of Defendants' breaches of their duties, Defendants caused Plaintiff to suffer actual losses. Specifically, Plaintiff has been required, or

will be required, to investigate, design, construct and operate and maintain water treatment systems necessary to filter PFOS and PFOA from Westfield's drinking water system, suffered property damage requiring investigation, clean-up, abatement, remediation, and monitoring costs, and suffered other damages in an amount to be determined at trial. Defendants are strictly, jointly, and severally liable for all such damages.

**COUNT IV**

**Violation of Massachusetts Consumer Protection Act
Against Manufacturing Defendants**

142.    Plaintiff incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein and further alleges as follows:

143.    The wrongful acts of Defendants, including its representations, omissions and breaches of implied warranty, constitute unfair and deceptive acts in violation of Massachusetts General Laws Chapter 93A, §§ 2 and 9.

144.    Defendants could have effectively communicated a warning regarding the known dangers of AFFF to Plaintiff, an easily identifiable public water supplier, but chose not to.

145.    Defendants' violations of Chapter 93A were willful and knowing.

146.    Pursuant to Massachusetts General Laws Chapter 93A, § 9(3), Plaintiff delivered to Manufacturing Defendants a written demand for relief on November 28, 2017. Manufacturing Defendants responded to Plaintiff's demand on January 31, 2018. 3M stated that it "rejects the City's demand" and Tyco stated that it "does not believe it would be in a position to provide a settlement offer to Westfield's demands . . . ."

## COUNT V

### Breach of Contract
### Against USAF and ANG

147.     Plaintiff incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein and further alleges as follows:

148.     On December 12, 2006, the USAF entered into a valid and binding lease agreement with the City to lease approximately 182 acres of land located at the northern end of the Westfield-Barnes Regional Airport until at least June 30, 2105.

149.     As part of its lease agreement with the City, the USAF agreed to "comply with all federal, state and local statutes, regulations, executive orders or ordinances" relating to the use or cleanup of any toxic chemicals on or from the Base agreed to pay the City for any damages caused by the ANG's use of the Base." Ex. A, ¶ 11(g).

150.     As part of its lease agreement with the City, the USAF agreed to be "responsible for remediating to the state or federal promulgated standard whichever is more stringent concerning any soil or water contamination resulting from their activities on the [Base]." Ex. A, ¶ 11(g).

151.     The USAF/ANG's storage, handling, transportation, and/or use of AFFF containing PFAS at the Base caused soil and groundwater contamination at the Base and contaminated the groundwater that the City uses as a public drinking water supply.

152.     The USAF/ANG has breached its lease agreement with the City by refusing to accept responsibility for the PFAS contamination on the Base and in the groundwater that is the source of the City's public drinking water supplies and by refusing to pay the City for damages it has suffered by the UASAF/ANG's the operation of its base.

153.    As a direct and proximate result of the USAF/ANG's breaches of their duties, the USAF/ANG caused Plaintiff to suffer actual losses.  Specifically, Plaintiff has been required, or will be required, to investigate, design, construct and operate and maintain water treatment systems necessary to filter PFOS and PFOA from Westfield's drinking water system, suffered property damage requiring investigation, clean-up, abatement, remediation, and monitoring costs, and suffered other damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A.    Enter judgment in its favor and against Defendants on each Count of this Complaint;

B.    An order that Defendants pay all damages suffered by Plaintiff, including but not limited to investigation, clean-up, abatement, remediation, engineering, treatment and monitoring costs incurred by Plaintiff, or for which Plaintiff is or was legally responsible, to comply with the EPA's public health advisories and the Commonwealth's soil and groundwater cleanup standards and drinking water standards and criteria;

C.    An award to Plaintiff for the costs of this suit (including but not limited to expert fees) and reasonable attorneys' fees, as provided by law;

D.    An award for treble and punitive damages; and

E.    An award for such other and further relief as the nature of this case may require or as this court deems just, equitable and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands a jury trial.

CITY OF WESTFIELD,
By Their Attorneys,

*/s/ Kevin Madonna*
Kevin Madonna
Kennedy & Madonna, LLP
48 Dewitt Mills Road
Hurley, NY 12443
Tel.: (845) 481-2622
Fax: (845) 230-3111
kmadonna@kennedymadonna.com

Susan Phillips, City Solicitor (BBO #544275)
City Hall – Room 320
59 Court St.
Westfield, MA  01085
Tel.: (413) 572-6260
Fax: (413 568-6745
s.phillips@cityofwestfield.org

John E. Garber, Assistant City Solicitor (BBO #635313)
Weinberg & Garber, P.C.
71 King Street
Northampton, MA  01060
Tel.: (413) 582 6886
Fax: (413) 582 6881
jgarber@w-g-law.com

Richard W. Head
Of Counsel
SL Environmental Law Group
450 Mission Street, Suite 400
San Francisco, CA  94105
Tel. (415) 348-8300
Fax (415) 384-8333
rhead@slenvironment.com

Michael A. London
Rebecca Newman
Douglas & London, PC
59 Maiden Lane, 6th Floor
New York, NY  10038
Tel. 212-566-7500
Fax 212-566-7501
mlondon@douglasandlondon.com
rnewman@douglasandlondon.com

Ned McWilliams
Wesley Bowden
Levin, Papantonio, Thomas, Mitchell, Rafferty
& Proctor, P.A.
316 S. Baylen St., Suite 600
Pensacola, FL  32502
Tel. 850-435-7067
Fax 850-436-6066
nmcwilliams@levinlaw.com
wbowden@levinlaw.com

DATED: April 5, 2019